IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RYAN GRANGER,

       Plaintiff,

v.                                     No. Civ. 2:20-cv-01075-JCH-JHR

JOSE PADILLA,
BILLY MASSINGILL,
DILLON SAMANIEGO, and
BOARD OF COUNTY COMMISSIONERS
OF EDDY COUNTY D/B/A/ EDDY COUNTY
DETENTION CENTER,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

       This case arises from an incident in which Plaintiff Ryan Granger, a pretrial detainee, was violently assaulted by another inmate while detained at the Eddy County Detention Center. Being assaulted in a detention facility is not part of the penalty that criminal offenders must pay, but constitutional liability for jail officials for a failure-to-prevent-harm claim only attaches when the inmate is incarcerated under conditions posing a substantial risk of serious harm and where the jail officials are deliberately indifferent to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Defendants Jose Padilla, Billy Massingill, Dillon Samaniego, and the Board of County Commissioners of Eddy County ("Eddy County") (collectively, "Defendants") filed a *Motion for Summary Judgment on the Basis of Qualified Immunity* (ECF No. 47), arguing that Plaintiff cannot show that any of the Defendants were deliberately indifferent to Plaintiff's rights or that it was clearly established that Defendants' actions violated his rights. Plaintiff opposes the motion. According to Plaintiff, summary judgment should be denied because the defense of qualified

immunity does not apply to the facts here, and alternatively, that the Court should permit Plaintiff leave to obtain necessary discovery essential to opposing the motion under Federal Rule of Civil Procedure 56(d). The Court, having considered the motion, briefs, evidence, and applicable law, concludes that the motion for summary judgment should be granted as to Plaintiff's Fourteenth Amendment claim against Defendant Padilla but denied as to the other Defendants at this time to allow Plaintiff an opportunity to conduct discovery under Rule 56(d).

## I.   FACTUAL BACKGROUND

### A.  Granger and Carrasco's admission into the Eddy County Detention Center

On May 28, 2020, Eric Carrasco ("Carrasco") robbed and assaulted Ryan Granger ("Plaintiff" or "Granger"). (Defs.' Undisputed Fact ("UF") ¶ 1, ECF No. 47.)[1] Granger reported the attack to the police, resulting in Carrasco being charged with aggravated assault with a deadly weapon (knife), larceny over $500, and criminal damage to property over $1,000. (*See* Criminal Information, ECF No. 70-1; Granger Decl. ¶ 6, ECF No. 70-2.) Carrasco was booked into the Eddy County Detention Center ("ECDC") as a result of the charges. (Granger Decl. ¶ 6, ECF No. 70-2.) On July 1, 2020, Granger was taken into ECDC custody. (Defs.' UF ¶ 2, ECF No. 47.)

### B.  ECDC's written policies and practices

Defendant Billy Massingill ("Massingill") is ECDC's warden and chief administrator responsible for ECDC operations, supervision of inmates, and implementation of policies. (Pl.'s UF ¶ 58, ECF No. 70.) As chief administrator, he has control of the facility and is responsible for submitting proposed rules and regulations to the local governing body. (*Id.*) He can implement changes to policies to conform with legal standards without seeking Board approval. (*Id.*) Eddy County approved and adopted the policies that govern ECDC. (Pl.'s UF ¶ 59, ECF No. 70.) All

---

[1] The Court considers an "Undisputed Fact" as one asserted by the party and not disputed by the opposing party or disputed by the opposing party but without admissible evidence to refute the fact to create an issue of fact.

ECDC employees must read the policies and procedures manual. (Pl.'s UF ¶ 60, ECF No. 70.)

### 1. Admissions, classifications, and housing assignments

ECDC promulgated policies on Admissions and Booking for detainees, Policy 200.4, which includes an orientation for detainees during which they are assessed and initially classified to ensure safety and security. (Defs.' Ex. B, ECF No. 47-2 at 10 of 51.) Pursuant to ECDC's Reception Policy 200.5, detainees "are assigned to initial holding settings according to their immediate security needs, physical and mental condition, and other considerations." (*Id.* at 16 of 51.) A Classification Corporal, or in his absence, a Shift Supervisor, will make a permanent housing assignment for the detainee after assessing the detainee's behavior and charges. (*See id.*)

ECDC's Classification and Separation Policy 200.7 directs ECDC to classify each detainee in a way to ensure public safety and safe, humane treatment for the detainee by assessing the appropriate custody level and housing for a detainee during the first 72 hours of incarceration. (*Id.* at 17 of 51.) Classification Corporals are to conduct periodic reviews of a detainee's status as needed in response to changes in behavior and circumstances. (*Id.*) ECDC has three custody levels (maximum, medium, and minimum), and ECDC uses an initial Classification form with a custody assessment scale to establish the detainee's most appropriate custody level. (*Id.* at 17-18 of 51.) Detainees who are charged with high risk and/or violent offenses, have displayed serious behavioral problems, and pose known risks to themselves or others, among other things, should be classified as maximum-security and housed in secure, single cell housing. (*See id.* at 17.) Medium security inmates are housed in double or multi-occupancy cells, while minimum security inmates may be in open bay or dormitory housing areas, because the latter detainees pose no known or significant threat to security. (*Id.* at 17-18.) ECDC contains numerous housing units, some with open dormitories like the Gamma and Kappa pods. (*See id.* at 25-26 of 51; Pl.'s Ex. 11, ECF No.

70-11.)

Additionally, ECDC has restrictive housing units for detainees that need to be segregated from the general population for various needs, including detainees identified as potential or confirmed victims of sexual assault. (Defs.' Ex. B, ECF No. 47-2 at 19 of 51.) The restrictive housing policy does not include detainees who are testifying witnesses against anyone in the facility. (*See id.*) Detainees identified as a high risk of being sexually abused by another detainee must be placed in a cell or housing unit that provides a high level of supervision and minimizes contact with potential predators, including potentially a restrictive housing unit. (*Id.* at 20 of 51.) If a detainee is at any time identified as a victim or potential victim of sexual misconduct, the detainee shall be re-evaluated for appropriate housing within 14 days. (Pl.'s Ex. 24, ECF No. 70-24 at 8 of 16.)

Staff completes an Initial Custody Assessment Scale Form to determine a detainee's proper custody level and housing assignment. (Defs.' Ex. B, ECF No. 47-2 at 20-21 of 51.) The screening forms contain "PREA CONCERNS" information for, among other things, potential risk of victimization, such as a detainee's young age, slight build, sexual orientation of gay or bisexual, and prior sexual victimization. (*See id.* at 32 of 51.) Generally, ECDC classifies detainees in a manner that keeps them in separate pods or units from other inmates who are known to be incompatible with the inmate for various reasons. (Massingill Decl. ¶ 6, ECF No. 47-2 at 2 of 51.)[2] ECDC, however, had no policy to keep known incompatibles from being housed in adjacent pods. (Pl.'s UF ¶ 17, ECF No. 70.) ECDC's warden reviews the Initial Custody Assessment Form that

---

[2] Plaintiff disputes this fact by pointing out that the policies themselves are not specific about separating known incompatibles. Plaintiff, however, failed to refute Massingill's sworn statement in his Declaration concerning ECDC's practice of separating known incompatibles with admissible evidence to create an issue of material fact. Moreover, evidence submitted regarding Granger's inmate file supports Massingill's statement that ECDC obtained information from Granger concerning known incompatible inmates for classification and housing assignment purposes. (*See* Defs.' Ex. B, ECF No. 47-2 at 4-5 of 51.)

shows the detainee's classification assessment and housing assignment. (Pl.'s UF ¶ 25, ECF No. 70.) When a detainee's continued presence in the general population poses a serious threat to him, any administrator, shift supervisor, or assistant shift supervisor may order the detainee to administrative segregation. (Defs.' Ex. B, ECF No. 47-2 at 27 of 51.)

### 2. Supervision of Detainees

ECDC has a control center, which is the hub of all external and internal security and communication activity. (Pl.'s Ex. 28, ECF No. 70-28.) Major responsibilities of the control center officer include controlling the doors, grilles, and gates; monitoring radios, telephones, intercoms, closed circuit televisions, and other communications systems; recording all appropriate information in the control center log; and notifying the shift supervisor of any emergency or alarm signal from any of the monitoring systems or staff. (*Id.*) ECDC only assigned one officer to the master control, and that officer was responsible for monitoring 210 camera feeds on six monitors. (Pl.'s UF ¶ 13, ECF No. 70.) The master control officer was to "maintain constant observation of every unit occupied by staff, detainees and volunteers." (Pl.'s Ex. 6, ECF No. 70-6 at 2.) The control center officer was also responsible for opening doors throughout the detention center, answering phone calls and intercom calls, and directing calls to the appropriate person in the facility. (Pl.'s UF ¶ 13, ECF No. 70.)

ECDC does not station corrections officers in a post in the Kappa or Gamma dormitories. (Pl.'s UF ¶ 9, ECF No. 70.) Instead, hallway officers are assigned make walkthroughs of the pods. (Pl.'s UF ¶ 10, ECF No. 70.) According to ECDC Policy 200.00, to facilitate personal contact with detainees, detention staff are directed to go into each housing unit and perform security checks at least every 30 minutes at irregular intervals. (Defs.' Ex. B, ECF No. 47-2 at 41-42 of 51.)  Policy 200.00 instructs officers to make rounds and "directly observe each detainee in person at least

twice per hour but no longer than 30 minutes per round on an irregular basis." (*Id.* at 42 of 51.) Staff must document the supervision rounds and Shift Supervisors must inspect all unit logbooks to ensure supervision rounds are being made. (*Id.*)

The units have video kiosks for inmate use and an intercom for emergency use. (Defs.' UF ¶ 4, ECF No. 47.) However, it usually took inmates at least a day to get a response to requests made through the kiosk. (Granger Decl. ¶ 31, ECF No. 70-2.)

### 3. Annual analyses and prior incidents of inmate-on-inmate violence

According to ECDC Policy 100.06, an annual analysis will be conducted "of serious detainee injuries as a proactive strategy to identify causes of injuries and formulate corrective action." (Pl.'s Ex. 15, ECF No. 70-15.) The warden, or his designee, will analyze annually the facility injury experience for serious detainee injuries to identify causes of injuries and develop and implement corrective actions. (*Id.*) From August 8, 2019, to July 26, 2020, ECDC personnel reported 63 incidents of inmate-on-inmate altercations. (*See* Pl.'s Ex. 13, ECF No. 70-13; Vazquez Report, ECF No. 70-14 at 3 of 72.)[3] Of those incidents, 33 assaults (an average of 1.8 per month) went unobserved by ECDC staff. (Vasquez Report 3, ECF No. 70-14.)

### 4. Annual analyses of staffing levels and staffing levels in practice

ECDC's stated policy on Staffing is to have "the staff needed to provide full coverage of designated security posts, full surveillance of detainees, and to perform all ancillary functions" and to schedule adequate staff to provide safe and secure facility operations. (Pl.'s Ex. 16, ECF No. 70-16.) ECDC is to conduct an annual, comprehensive staffing analysis to determine staffing needs

---

[3] Defendants argue that these reports are inadmissible hearsay. Discovery, however, has been stayed pending resolution of this motion. Plaintiff seeks Rule 56(d) discovery to obtain admissible evidence concerning the reports. Moreover, Plaintiff's expert reviewed the reports, determined the number of incidents, and included this information in his report. The Court will therefore rely on the fact that there were 63 reported incidents of violent inmate-on-inmate incidents from August 8, 2019, through July 26, 2020. This evidence is also relevant to the issue of whether Plaintiff should receive additional discovery regarding the incidents described in the reports.

and plans. (*Id.*)

In 2018, ECDC commissioned a Maintenance and Operational Needs Assessment report by a third-party to assess, among other things, security staffing practices and levels at ECDC and to identify the appropriate number of security staff needed. (*See* Pl.'s Ex. 17, ECF No. 70-17 at 1, 4 of 10; Defs.' Ex. I, ECF No. 83-1 at 1 of 21.)[4] The assessors considered numerous factors, but one of the factors used was a shift relief factor to identify the number of Full Time Equivalent ("FTE") positions needed to allow for employees taking leave and being pulled away from post assignments for training and breaks. (*See* Defs.' Ex. I, ECF No. 83-1 at 15 of 21.) According to the May 4, 2018, final report, if all housing units in ECDC were in use, ECDC needed 70 detention officers and 98 total staff to safely and securely operate the facility, but if the Omega Units were closed, ECDC needed only 55 detention officers and 82 total staff. (*See* Pl.'s Ex. 17, ECF No. 70-17 at 10 of 10.)[5]

With respect to staffing Central Control, the report found that Central Control operations were "key to facility security and response to emergency incidents," and that "the responsibilities of the existing post" was "too great for any single individual, especially during the more active

---

[4] Defendants object to the Court's consideration of the report commissioned by ECDC based on hearsay. (Def.'s Reply 9, ECF No. 83.) Eddy County contracted with CGL to prepare the report. (Pl.'s Ex. 17, ECF No. 70-17 at 4 of 10.) The report is being offered against Eddy County and was made by a person whom Eddy County authorized to make a statement on the subject and the report appears to have been made by Eddy County's agent on a matter within the scope of that relationship and while it existed. The Court therefore finds that the report is not hearsay under Federal Rule of Evidence 801(d)(2)(C)-(D). *See* Fed. R. Evid. 801(d)(2) (defining an opposing party's statement, which is not hearsay, as a statement that is offered against an opposing party and "(C) was made by a person whom the party authorized to make a statement on the subject" or "(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed"). Alternatively, the Court may consider the contents of the report when determining whether Plaintiff should be permitted additional Rule 56(d) discovery to develop other admissible evidence regarding the contents thereof.

[5] Defendants dispute that the report concluded that ECDC was understaffed, asserting that the assessment only recommended adding four more positions, two of which were in transportation, and did not recommend increasing the number of full-time hallway officers. (Defs.' Reply 9-10, ECF No. 83.) At this stage, the Court must construe facts favorably to Plaintiff who presented evidence that additional detention officers should be added for the safe operation of the facility. As discussed *infra*, Plaintiff is entitled to additional Rule 56(d) discovery on the factual issue of understaffing, and the Court will await full development of the record before determining whether understaffing caused Plaintiff's Eighth Amendment rights to be violated.

daytime hours." (Defs.' Ex. I, ECF No. 83-1 at 13 of 21.) The report stated: "It was not possible for the single staff assigned to this post to adequately monitor the camera system, answer phones, and control the opening and closing of every door along with their many other duties." (*Id.*) Consequently, the report recommended ECDC establish a second post in Central Control daily from 6:00 a.m. to 6:00 p.m. (*Id.*) Plaintiff's expert agrees that the control center officer is responsible for too many duties to handle them effectively, and two officers should have been assigned to the post on the busiest watches. (Vasquez Report 3-4, ECF No. 70-14.)[6]

ECDC only had 44 detention officers and 68 total staff available for post at the time of the assessment. (Pl.'s Ex. 17, ECF No. 70-17 at 10 of 10.) The Board did not take any actions driven by the May 4, 2018, report. (*See* Pl.'s Ex. 18, ECF No. 70-18 at 2 of 6.). In July 2020, ECDC had 44 detention officers available to work. (*See* Pl.'s Ex. 19, ECF No. 70-19.)

### C.  Classifications and housing assignments for Carrasco and Granger

Carrasco was classified as a maximum-security inmate on July 1, 2020. (Pl.'s UF ¶ 27, ECF No. 70.) However, he was housed in the Gamma pod, a minimum/medium security general population dormitory housing pod. (*Id.*) Carrasco had been classified as a maximum-security detainee on six previous occasions. (Pl.'s UF ¶ 28, ECF No. 70.)

Granger is homosexual, presents as effeminate, and has a slight build. (*See* Granger Decl. ¶ 8, ECF No. 70-2.) On July 2, 2020, Granger was initially classified as medium security. (Pl.'s Ex. 25, ECF No. 70-25.) He informed staff that he had 11 incompatible persons to keep separate from him while in ECDC custody, including Carrasco. (Defs.' UF ¶ 6, ECF No. 47; Pl.'s UF ¶ 22,

---

[6] Defendants contend the Court may disregard this fact because it is the conclusory opinion of an expert. *See Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) ("the testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact"). The expert testimony, however, is corroborated by the May 4, 2018, report that recommended a second post in Central Control during the daytime shift. The Court finds that the opinion is not conclusory and raises a factual question, which at the summary judgment stage, the Court must construe in favor of the non-moving party.

ECF No. 70.) Granger, however, did not report the specifics of his incompatibility with Carrasco, only reporting that they had problems from the street. (Defs.' UF ¶ 7, ECF No. 47.) ECDC staff did not ask questions about the nature of the problems he had with Carrasco. (Granger Decl. ¶ 9, ECF No. 70-2.) Nor did ECDC have a policy of asking detainees if they are or have been testifying witnesses against anyone in the facility. (*See* Vasquez Report 2, ECF No. 70-14.) Prior to July 18, 2020, Cristobal Rojas was not on Granger's list of incompatible persons. (*See* Massingill Decl. ¶ 9, ECF No. 47-2 at 2 of 51; Defs.' Ex. B, ECF No. 47-2 at 4 of 51.)

On July 4, 2020, ECDC placed Granger in the Beta 3 pod after he verified, upon being shown a roster, that he had no known incompatible persons in that pod. (Defs.' UF ¶ 8, ECF No. 47.) After a few days, Granger began to have problems with other detainees in the Beta 3 pod sexually harassing him due to his sexual orientation, and he was afraid he would be jumped if he remained in his assigned pod. (Granger Decl. ¶ 13, ECF No. 70-2.) He alerted Officer Romero when she was conducting a walkthrough of the pod by telling her he needed to get out. (*Id.* ¶ 14.) She immediately took him outside the pod where he could explain the situation, and she did not return him to the Beta 3 pod, instead rehousing him in a single-cell unit. (*Id.*)

On July 14, 2020, Granger was moved to the Kappa pod, a general population dormitory next to the Gamma pod. (Pl.'s UF ¶ 36, ECF No. 70.) Detainees in the Kappa and Gamma pods could talk to each other through the doors, which happened all the time. (Granger Decl. ¶¶ 17-18, ECF No. 70-2.) Staff members were aware that inmates could communicate through the doors, and would tell them not to, but would not discipline them for doing so. (*Id.*)

Before moving to the Kappa pod, a classification officer showed Granger a list of detainees in that pod, and Granger verified that he had no known incompatible persons in Kappa based on that roster. (*See id.* ¶ 19.) The officer did not show him a list of detainees in the Gamma pod next

door. (*Id.*) Granger would not have agreed to be housed in the Kappa pod had he known Carrasco

was in the Gamma pod. (*Id.*)

### D.  Supervision and monitoring on Saturday, July 18, 2020

On July 18, 2020, four of the assigned thirteen detention center officers were out on leave,

and two officers filled the vacant positions. (*See* Pl.'s Ex. 20, ECF No. 70-20.) One of the officers

filling in was Defendant Dillon Samaniego ("Samaniego"). (*See id.*; Pl.'s Ex. 8, ECF No. 70-8 at

6 of 17.) On the day and time of the attack, Samaniego was assigned to the master control center.

(*See* Pl.'s Ex. 6, ECF No. 70-6 at 2-3 of 6; Pl.'s Ex. 7, ECF No. 70-7.) The Kappa pod had video

feed capturing the entrance to the pod from the hall and another video feed capturing the main unit

housing area. (Defs.' UF ¶ 11, ECF No. 47.) As the officer assigned to master control, Samaniego

was aware that there was a blind spot in the camera view of the door and window of the Kappa

pod that did not show the floor. (Pl.'s UF ¶ 54, ECF No. 70.) Three hallway officers were also on

duty that day: Defendant Jose Padilla ("Padilla"), Rose, and Williams. (*See* Pl.'s Ex. 20, ECF No.

70-20 at 1 of 8.) Padilla was assigned to conduct walkthroughs. (Pl.'s UF ¶ 12, ECF No. 70.)

Between 10:03 a.m. and 1:07 p.m., Padilla only conducted one walkthrough in the Kappa pod at

12:20 p.m. (*See* Pl.'s UF ¶ 12, ECF No. 70; Defs.' Ex. B, ECF No. 47-2 at 41-42 of 51.)

### E.  Attack on Granger on July 18, 2020[7]

On July 18, 2020, Granger was still in the Kappa pod. (Defs.' UF ¶ 11, ECF No. 47.) At

12:07 p.m., Granger used the phone kiosk, and he had a conversation with Rojas until about 12:10

---

[7] The parties submitted video evidence that captured part of the attack that occurred in this case. In a case where there is a video recording capturing the events in question, a court should not rely on a version of facts that is utterly discredited by the video evidence, and instead view the facts in the light depicted by the video recording. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Consequently, the facts set forth in the next section are drawn from the undisputed evidence; the video recordings; and, for the facts not conclusively established in the video recording, those facts that are supported by admissible evidence and construed in the light most favorable to Plaintiff, the non-moving party.

p.m. (Defs.' UF ¶ 14, ECF No. 47.) From 12:10 to 12:11 p.m., and again from 12:13:10-12:13:22 p.m., Granger and Rojas spoke to one another. (Defs.' UF ¶¶ 15-16, ECF No. 47.) Rojas told Granger that he was Carrasco's "homie," and that Granger needed to talk to Carrasco to fix the problems he had with Carrasco. (Granger Decl. ¶ 21, ECF No. 70-2.) Granger felt like he had to talk to Carrasco because Rojas and Rojas's friends were watching him. (*Id.* ¶ 22.)

From 12:13:24 to 12:19:00 p.m., Granger spoke with Carrasco through the door between the Kappa and Gamma pods. (Defs.' UF ¶ 17, ECF No. 47; Granger Decl. ¶ 23, ECF No. 70-2.) Rojas stood behind Granger during this conversation. (*See* Pl.'s Ex. D at 12:13:24-12:19:00.) Carrasco told Granger he would not leave the jail unless he let him, and that he was not going to let his people allow him to leave. (Granger Decl. ¶ 23, ECF No. 70-2.) Granger understood this statement as a threat to his life and was worried he would be jumped if he did not get out of the pod. (*See id.* ¶¶ 23-24.) He did not know, however, who was going to jump him or precisely when that might happen. (*Id.* ¶ 24.)

Granger stopped talking to Carrasco when ECDC personnel opened the Kappa door. (Defs.' UF ¶ 17, ECF No. 47.) At 12:20:08 p.m., Padilla entered the Kappa pod to conduct a walkthrough. (Defs.' UF ¶ 18, ECF No. 47; Pl.'s UF ¶ 41, ECF No. 70.) When he entered, Granger was standing next to his bunk. (Granger Decl. ¶ 25, ECF No. 70-2.) Padilla walked towards Granger briskly and pointed at him. (*See* Defs.' Ex. D at 12:20:09-12:20:15.) As Padilla walked past him, Granger tried to get Padilla's attention and told him, "I need to get out." (Granger Decl. ¶ 26, ECF No. 26.)[8] Padilla walked briskly through the pod, and he was only in the pod for about

---

[8] Defendants dispute Plaintiff's version of his interaction with Padilla. According to Defendants, Padilla instructed Granger to move away from the door, and Granger said ok or something like that in acknowledgement. (Padilla Interog. No. 6, ECF No. 47-4 at 3 of 5.) Granger in his declaration states that Padilla entered the pod, Granger immediately tried to get his attention, looked right at him, told him, "I need to get out," yet Padilla just pointed at him and walked right past him and ignored him. (*See* Granger Decl. ¶¶ 25-27.) Defendants contend that the video blatantly contradicts Granger's statement that he looked at Padilla and told him he needed to get out, and then Padilla pointed at him and walked past. Having reviewed the video, the Court finds the order of events as follows: Padilla pointed to

42 seconds until 12:20:50 p.m. (*See* Defs.' Ex. D at 12:20:08-12:20:50; Defs.' UF ¶ 22, ECF No. 47.) Padilla would have passed by Granger as he left the pod, but neither spoke to one another as he left. (*See* Defs.' Ex. D at 12:20:08-12:20:52; Granger Decl. ¶ 28, ECF No. 70-2.)

Rojas was standing near Granger while Padilla was in the pod, so Granger feared making a big scene. (Granger Decl. ¶ 29, ECF No. 70-2.) He also feared using the kiosk because Rojas was following him, his friends were watching him, and it usually took a day to get a response through the kiosk. (*Id.* ¶ 31.) Instead, Granger tried to convince Carrasco to call off his order to jump him. (*See id.* ¶ 30.) Granger spoke with Rojas for about a minute at 12:22 p.m., and then spoke to Carrasco through the door between the units at about 12:27:50 p.m. (*See* Defs.' UF ¶¶ 23-25, 31, ECF No. 47; Granger Decl. ¶¶ 30, 32, ECF No. 70-2; Defs.' Ex. D at 12:22:15-12:30:22.) Carrasco told Granger he needed to sign an affidavit stating that he was innocent in the case against him and send it to his lawyer. (Granger Decl. ¶ 32, ECF No. 70-2.)

While they were talking, at 12:30:22 p.m., Rojas struck Granger in the head from behind. (Defs.' UF ¶ 26, ECF No. 47; Granger Decl. ¶ 33, ECF No. 70-2.) Rojas beat Granger savagely for two minutes and 43 seconds. (*See* Granger Decl. ¶ 33, ECF No. 70-2; Defs.' Ex. D at 12:30:22-12:33:05; Pl.'s UF ¶ 48, ECF No. 70.) ECDC's Kappa Window video camera captured Rojas hitting Granger, who was knocked to the ground, and Rojas was visibly punching and kicking him. (*See* Defs.' Ex. D at 12:30:22-12:33:05.) From 12:31:38 until 12:32:05 p.m., the fight occurred

---

Granger right after he walked in at 12:20:13 p.m., Granger said something at 12:20:15 p.m., and Padilla walked by him by 12:20:16 p.m. (*See* Defs.' Ex. D at 12:20:08-12:20:18.) Padilla was wearing a mask, so the Court cannot find that the video clearly establishes that Padilla said something to Granger. Defendants further argue that the video shows that Granger did not use enough syllables to have stated, "I need to get out." (*See* Defs.' Reply 4-5, ECF No. 83.) Again, the Court cannot find that the video blatantly contradicts Granger's statement that he told Padilla, "I need to get out." It was a very brief exchange, and what Granger said occurred in about a second, but the Court cannot say that, from the video evidence, it is not possible that Granger said those words. That Granger's declaration was not completely accurate about the order of events does not compel a conclusion that he was lying about having said, "I need to get out." Because the video does not clearly contradict Granger's statement of what he told Padilla, the Court must construe those facts in Plaintiff's favor.

below a wall, so nothing was visible from the Kappa Window video camera for 27 seconds. (*See id.*; Defs.' UF ¶ 28, ECF No. 47.) But from 12:32:05 until 12:33:05 p.m., the fight was again visible on the video camera. (*See* Defs.' Ex. D at 12:30:22-12:33:05.) Camera views also captured inmates reacting to and showing interest in watching the fight. (*See* Defs.' Ex. E, 12:30:22-12:33:10; Pl.'s Ex. 5.) Granger escaped the fight around 12:33:05 p.m. (*See* Defs.' Ex. D at 12:30:22-12:33:05.)

Samaniego denied witnessing the attack as it occurred, noting that he does not know the exact time it happened or what he was doing in the exact time frame. (Samaniego Interrog. No. 2, ECF No. 47-5 at 2 of 4.) In his July 21, 2020, incident report, he explained that around 12:30 p.m., Carlsbad Police Department was bringing in a new, combative, female for intake. (*See* Pl.'s Ex. 7, ECF No. 70-7.) However, he was not monitoring the booking area at the time. (*See* Pl.'s Ex. 8, ECF No. 70-8 at 15 of 17; Pl.'s Ex. 9, ECF No. 70-9.)[9]

After the attack, Granger pushed the intercom button to try to get medical attention, but no one responded. (Pl.'s UF ¶ 52, ECF No. 70; Granger Decl. ¶ 36, ECF No. 70-2.) Samaniego noticed the intercom from the unit was pressed, he heard several voices, but it clicked off. (Pl.'s UF ¶ 52, ECF No. 70; Pl.'s Ex. 27, ECF No. 70-27.) Granger pushed the intercom button a second time a while later. (Granger Decl. ¶ 36, ECF No. 70-2.) Samaniego asked, "How can I help you?" (Pl.'s Ex. 27, ECF No. 70-27.) After hearing static, he told hallway officers that checks were due. (*Id.*) He did not mention that the intercom button had been pressed. (*See id.*)

At approximately 1:30 p.m., about an hour after the attack, Officer Christian Williams

---

[9] Plaintiff asserts that an inference should be made from the conflicting evidence that Samaniego saw the attack as it occurred. Defendants dispute that such an inference may be drawn from Plaintiff's submitted evidence. The Court finds such an inference far too speculative to make reasonably based on the evidence in the current record. *Cf. Lance v. Morris*, 985 F.3d 787, 794-96 (10th Cir. 2021) (concluding on summary judgment record that there was insufficient evidence that guard was deliberately indifferent to inmate suffering from a medical condition where there was no evidence he actually entered the pods, whether he saw inmate, or that any observation would have revealed intensity of inmate's condition; that his job responsibilities included moving around facility and conducting sight checks from control tower were not enough to show knowledge of inmate's condition and need for treatment).

noticed Granger had injuries on his face and head, so he pulled him out of the Kappa unit and took him to the medical unit. (Pl.'s Ex. 29, ECF No. 70-29.) Granger suffered a skull fracture, a fractured orbital, two zygomatic fractures, a fractured rib, and painful bruising and swelling. (Pl.'s UF ¶ 49, ECF No. 70.) Rojas admitted to officers later that he attacked Granger because Carrasco told him to, because Granger was pressing charges against Carrasco; and if Rojas refused, Carrasco would have gotten other inmates to jump Rojas. (Pl.'s UF ¶ 50, ECF No. 70.)

## II.  PROCEDURAL HISTORY

Plaintiff filed suit against Defendants for various federal and state claims, seeking compensatory and punitive damages arising from his injuries. (First Am. Compl. 8-11, ECF No. 76.) Granger asserts in Count I that Defendants deprived him of his right to humane conditions of confinement under the Fourteenth Amendment by failing to ensure his reasonable safety in ECDC's custody. (*Id.* at 8-9.) He contends that Defendants knew of the serious risk of harm to him based on the pattern of violence at ECDC, and that he told Padilla about the impending attack, yet Defendants were deliberately indifferent to his safety resulting in his injuries. (*Id.*) He asserts claims against Defendants Padilla and Samaniego in their individual capacities and against Defendant Massingill in both his individual and official capacities. (*Id.* at 3.) In Count II, Granger asserts that ECDC is liable for a custom and policy of failing to supervise detainees to deter attacks and allow their rescue and creating conditions that created unsafe housing of detainees. (*Id.* at 9.) Finally, Granger brings state tort claims for negligence against ECDC (Count III), negligently operating a building/equipment against ECDC (Count IV), and violation of his substantive due process right under the New Mexico Constitution to humane conditions of confinement against all Defendants (Count V). (*Id.* at 10-11.)

Subsequently, Defendants filed their motion for summary judgment (ECF No. 47) and their

unopposed motion to stay pending the Court's decision on their motion for summary judgment (ECF No. 51). The motion for stay recognized that Plaintiff's counsel would file motions for limited discovery. (Defs.' Mot. to Stay 1, ECF No. 51.) The Honorable Gregory J. Fouratt entered an order staying discovery until this Court enters a ruling on the motion for summary judgment, but he noted that the order did not affect Plaintiff's ability to move for limited discovery under Federal Rule of Civil Procedure 56(d). (Order, ECF No. 54.)

Plaintiff has been unable to take depositions or obtain paper discovery from Warden Massingill. (Freedman Smith Decl. ¶¶ 10-11, ECF No. 70-3.) Plaintiff has received the following discovery: two sets of interrogatories, requests for production and requests for admission to the Board; one set of interrogatories, requests for production and requests for admission to Padilla and to Samaniego; and initial disclosures. (*Id.* ¶ 9.) Plaintiff received some requested documents under the New Mexico Inspection of Public Records Act, including some classification documents, but he has not received the classification forms, scoring instruments, or initial custody assessment forms for Granger, Rojas, or Carrasco. (*Id.* ¶¶ 15, 17(a)-(b).) Nor has he received requested discovery concerning Carrasco's disciplinary history from ECDC; training curriculum for officers at ECDC; inmate grievances regarding assaults and threatened assaults in the year preceding the attack; reports concerning all assaults at ECDC for three years leading up to the attack; ECDC's annual reports regarding injury prevention; hallway and master control logs for the year prior to the attack; and classification and housing records for detainees for the year prior to the attack. (*See id.* ¶ 17(c)-(i).) Plaintiff seeks this information as well as the depositions of Samaniego and Massingill, the Rule 30(b)(6) deposition of the Board, and depositions of classification officers to respond to Defendants' motion for summary judgment. (*See id.* ¶ 17(j).)

### III.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a summary judgment motion, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021).

The qualified immunity defense protects against the burdens of discovery as well as trial. *See Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991). A court has discretion to manage the discovery process to facilitate prompt and efficient resolution of the case while protecting government officials from insubstantial lawsuits. *See Crawford-El v. Britton*, 523 U.S. 574, 599-600 (1998). Federal Rule of Civil Procedure 56(d) provides a mechanism for a court to postpone ruling on a summary judgment motion so that the plaintiff can obtain additional discovery that is necessary to explore contested factual assertions. *See id.* at 599 n.20.

Rule 56(d) permits a non-moving party to identify "facts essential to justify its opposition" to a summary judgment motion that the party cannot yet present.  Fed. R. Civ. P. 56(d).  In order to satisfy the requirements of Rule 56(d), Plaintiff's affidavit must do more than simply indicate that he would like to engage in discovery; rather, the Rule 56(d) affidavit must (1) identify with specificity what probable facts are not available, (2) why those facts cannot be presented, (3) what steps the party has taken to obtain the facts, and (4) how additional discovery will rebut the summary judgment motion. *See Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010); *Libertarian Party of NM v. Herrera*, 506 F.3d 1303, 1308-09 (10th Cir. 2007); *Trask v. Franco*, 446 F.3d 1036, 1042 (10th Cir. 2006). When, as here, the defendant has raised qualified immunity as a defense, the non-moving party must show more specifically how the additional discovery is connected to facts needed to oppose the defendant's

qualified immunity assertion. *See Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990). If a party makes the necessary showing, the Court may defer considering the motion, deny it, allow additional time for discovery, or issue any other appropriate order. Fed. R. Civ. P. 56(d).

## IV.   ANALYSIS

Defendants argue that they are entitled to summary judgment because no individual state actor was deliberately indifferent to Plaintiff's rights, as required to establish a Fourteenth Amendment claim in the pretrial detainee context. Second, they assert that it was not clearly established that each Defendant's actions violated Plaintiff's rights. As to Defendant ECDC, they contend that ECDC cannot be liable because there was no underlying violation of Plaintiff's rights, ECDC's policies and procedures were not enacted with deliberate indifference, and their policies were not the moving force behind the attack on Plaintiff. The Court will first consider Plaintiff's evidence against the individual defendants before turning to his municipal liability claims.

### A.  Whether the Individual Defendants are Entitled to Qualified Immunity

Section 1983 provides that every person who, under color of law, subjects any person to a deprivation of federal or constitutional rights "shall be liable to the party injured in an action at law…." 42 U.S.C. § 1983. Government officials sued for damages under § 1983 may raise the defense of qualified immunity. *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016). When an official asserts a qualified immunity defense, the burden falls on the plaintiff to demonstrate that the defendant's actions violated a constitutional right and that the constitutional right was clearly established at the time of the conduct. *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021). "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.1997)).  A court has discretion in deciding which

prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A plaintiff can demonstrate that a constitutional right is clearly established by citing on-point decisions from the Supreme Court or the Tenth Circuit, or by showing that the clearly established weight of authority from other circuits shows the right is as plaintiff maintains. *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). The Tenth Circuit has cautioned that the Court's inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009) (internal quotations omitted). The plaintiff, however, need not have a case with precisely the same facts for officials to be on notice of clearly established law. *Truman*, 1 F.4th at 1235.

The constitutional right against the individual Defendants at issue here is Plaintiff's Fourteenth Amendment due process right not to be deprived of health and safety while detained in jail. Although pretrial detainees are protected under the Due Process Clause, rather than the Eighth Amendment, the same standard applies in both Eighth and Fourteenth Amendment failure-to-protect cases. *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999), *abrogated in part on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. Prison officials must take reasonable measures to guarantee the safety of inmates, including protecting prisoners from violence at the hands of other inmates. *Id.* at 832-33. An official, however, is only liable under the Fourteenth Amendment when (1) the deprivation is sufficiently serious (an objective component), and (2) the officer was deliberately indifferent to

18

the inmate's health or safety (a subjective component). *See id.* at 834; *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).

The objective component of the test is met if the harm suffered was sufficiently serious. *Callahan*, 471 F.3d at 1159. The prison or jail conditions must pose a substantial risk of serious harm to an inmate's health or safety. *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). Here, it is undisputed that Plaintiff suffered a beating for nearly three minutes and fractures to his skull and facial bones to prevent him from testifying against another inmate. This harm from inmate-on-inmate violence is sufficiently serious to satisfy the Fourteenth Amendment's objective component. *See Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (stating that inmate-on-inmate assault was objectively serious danger that posed substantial risk of harm to plaintiff); *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (explaining that objective component is met when harm suffered rises to sufficiently serious level and is significant, not trivial, suffering).

The subjective component requires showing that the defendant acted with a culpable state of mind, a *mens rea* that lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 836. As the *Farmer* Court held, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. While evidence of actual knowledge by a prison official is required, *Howard v. Waide*, 534 F.3d 1227, 1243 (10th Cir. 2008), the Supreme Court has explained that the defendant's knowledge of a substantial risk of serious harm may be proven by circumstantial evidence, including evidence

19

"that the risk was obvious." *Id.* at 842. "For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-43 (quotations omitted). Mere negligence is not enough to constitute deliberate indifference. *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006).

Additionally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. An official will thus be liable if he knows that an inmate faces a substantial risk of serious harm and disregards it by failing to take measures to reduce the risk. *Id.* at 847.

### 1. Jose Padilla

Defendants argue that Plaintiff cannot show that Padilla was aware of a substantial risk to Granger's health and safety. Construing the facts favorably to Plaintiff, Granger informed Padilla that he needed to get out after speaking through the door to the other pod. He did not report to Padilla that he was being threatened, nor did he attempt to say anything more to Padilla as Padilla left the pod. Plaintiff admits that he did not know that Rojas specifically was the one who was going to attack him. (Pl.'s Resp. 13, ECF No. 70 ("Granger was aware that he was in danger and that Carrasco was plotting to have someone attack him, but he did not know who was going to attack him or when the attack would occur.").) The question then is whether Padilla would know from, "I need to get out," that Granger was facing a substantial risk of harm.

It is not obvious from that statement alone that Granger was communicating an urgent need to get out due to a risk to his bodily safety. Plaintiff nevertheless argues that the risk was obvious to a prison official. In support, Plaintiff submitted evidence that on July 5, 2020, a different prison guard removed Granger from a pod to get more information when he told her he needed to get out. According to Plaintiff's expert, Granger's statement "should have alerted Officer Padilla that Granger was in danger" and that any corrections officer "would have recognized Granger could have been in danger and would know to speak privately with a detainee in this situation." (Vasquez Report 2, ECF No. 70-14.) While a factfinder may rely on circumstantial evidence to determine whether the prison official knew of a substantial risk or that a risk was obvious, more is required than should have known to satisfy the deliberate indifference standard. Plaintiff must show facts from which a jury could reasonably infer that Padilla actually drew the inference. *See Perry v. Durborow*, 892 F.3d 1166, 1122 (10th Cir. 2018) (explaining that prison official may be held liable if he was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, that he actually drew that inference, and that he failed to take reasonable steps to reduce that risk). There are no facts in the record that Padilla was himself trained to know or knew from past experience that when an inmate says he needs to get out, that he is facing a substantial risk of serious harm.

Plaintiff also relies on Padilla's failures to adhere to ECDC policies that required more frequent and longer walkthroughs, arguing that a jury could draw the inference that Padilla was deliberately indifferent to his safety. In support, Plaintiff relies on *Hostetler v. Green*, 323 F. App'x 653 (10th Cir. April 15, 2009), for the proposition that Padilla's knowledge that he violated policies, combined with his knowledge that the purpose of the policies was to ensure detainee safety, support the inference that he was deliberately indifferent to Granger's safety. *Hostetler*'s

facts, however, reveal a far more egregious and obvious risk to inmate safety.

In *Hostetler*, a jail guard permitted a male inmate to go into the cell of a female inmate. *Id.* at 654-55. He told the male inmate several times to leave the cell, but the inmate ignored the demands and stayed inside the cell. *Id.* at 655. In response, the guard shut and locked the plaintiff's cell door, leaving them alone and locked inside for approximately ten minutes, and during that time, the male inmate allegedly raped the female inmate. *See id.* The jail guard moved for qualified immunity on the female inmate's Fourteenth Amendment claims on the subjective intent component. *See id.* at 656-57. The district court denied his motion because the "evidence suggests that Green was aware of the jail policy of not allowing male inmates access to cells in which females were held and of the rationale for such policy, i.e. inmate safety and protection from possible sexual assaults." *Id.* at 656 (quoting district court opinion).

While agreeing that a failure to adhere to an administrative policy alone does not amount to a constitutional violation, the Tenth Circuit explained that the district court did not err *as a matter of law* in relying on the guard's knowledge of the policy, his awareness that the policy was enacted specifically to prevent sexual assault, and his knowledge that he did indeed violate the policy. *Id.* at 658. The Tenth Circuit concluded that these facts supported an inference that the guard was aware of an increased risk of sexual assault to the plaintiff when he violated the policy. *Id.* It noted, however, that it was not deciding whether a knowing violation of a policy with an understanding of the policy rationale was alone sufficient to create an inference of deliberate indifference, because the district court relied on other facts – that the guard tried three times to call the male inmate from the cell, that the inmate failed to respond, yet the guard closed the inmate in the cell with the female for ten minutes. *Id.* n.2.

Contrary to Plaintiff's argument, *Hostetler* does not compel the inference that Padilla was

deliberately indifferent based on his violation of ECDC's walkthrough policies. In *Hostetler*, the district court had multiple additional facts that made the guard's awareness of the risk of sexual assault from his actions far more obvious than the risk to inmate safety from the policy violations Plaintiff relies on here. The policies Plaintiff contends Padilla violated were to facilitate personal contact with detainees by interpersonal communication during walkthroughs and to conduct walkthroughs at least every 30 minutes at irregular intervals. It is undisputed, however, that while he did not conduct walkthroughs every 30 minutes that day, Padilla did conduct a walkthrough within approximately ten minutes of the attack. The record does not support an inference that adherence to the 30-minute walkthrough policy throughout the day would have prevented the attack, so this ground cannot support Plaintiff's claim. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1498 n.13 (10th Cir. 1990) (explaining that, because plaintiff did not present evidence to suggest that more extensive training could have prevented murder, the inadequate training allegation could not support jury's verdict).

As for the policy to facilitate personal contact, Plaintiff contends that Padilla spoke to no one during his walkthrough in violation of ECDC policy. Although this fact is disputed, the Court must construe the fact in favor of Plaintiff who averred that Padilla ignored him. A policy violation alone does not necessarily amount to a constitutional violation. There is insufficient evidence in the record to demonstrate that Padilla knew a substantial risk of serious harm existed to Granger from failing to stay in the pod longer or failing to engage in a longer conversation with Granger. Granger's statement to Padilla did not convey enough information to make it obvious that he had been threatened with bodily injury. Notably, Granger did not attempt to re-engage Padilla in conversation when Padilla circled back to the door. Negligence by Padilla in not doing a better, more thorough walkthrough does not meet the standard for deliberate indifference.

The other cases relied upon by Plaintiff are also distinguishable. In each of those cases, the plaintiff presented additional facts showing that the defendant was aware of a specific threat to the plaintiff's safety. *Cf. Howard v. Waide*, 534 F.3d 1227, 1230, 1238-40 (10th Cir. 2008) (reversing grant of summary judgment to three corrections officers because plaintiff proffered adequate evidence of their subjective knowledge of significant risk of substantial harm to him where they knew plaintiff had suffered brutal treatment at hands of gang members, knew he was openly gay, knew the general dangers the group presented, and knew that plaintiff had recently been recognized and approached by members of same gang in new facility, yet officers did nothing); *Gonzales v. Martinez*, 403 F.3d 1179, 1181, 1187 (10th Cir. 2005) (denying qualified immunity to sheriff where sheriff had statements from two women inmates describing their assault by two detention officers, yet he not only left the prisoners unprotected in the jail, but also in the custody and control of the very men accused of the assaults, among other evidence); *Berry*, 900 F.2d at 1496-98 (concluding there was enough evidence for jury to find City deliberately indifferent after inmate was murdered by two others he implicated in crime where inmate's wife informed jail employee that her husband feared for his safety and asked jail employee if there was any way he could be moved out of that cell, because the guys he informed on were going to be put in there with him, yet jail employees took no preventative action). Unlike in *Howard*, *Gonzales*, and *Berry*, the statement Granger made to Padilla was not obviously a plea for help and it did not inform him of a specific danger to Granger posed by another inmate.

Plaintiff nevertheless argues that Padilla cannot escape liability by willfully blinding himself to facts indicating a risk of harm. Officers cannot take refuge by putting their proverbially heads in the sand by failing to examine or verify underlying facts that they strongly suspect to be true regarding the specifics of a danger. *See Farmer*, 511 U.S. at 843 n.8 (noting that prison official

"would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation…).") Again, here the evidence is too thin to reasonably infer that Padilla strongly suspected Granger was in danger and refused to respond reasonably to the threat. This case is not like the cases relied upon by Plaintiff, such as *Velez v. Johnson*, where the officer knew that the inmate pushed an emergency call button and had told the officer he was not getting along with another inmate. *See Velez v. Johnson*, 395 F.3d 732, 734-36 (7th Cir. 2005) (concluding that officer could be held liable under Fourteenth Amendment, even though he did not specifically know that another inmate held razor to detainee's throat where he knew victim pushed emergency call button, victim had no history of abusing call button, guards were instructed to personally respond to emergencies by going to scene, and victim specifically told officer that he was not getting along with inmate, but officer did nothing). The lack of evidence in this case of Padilla's knowledge of danger similarly stands in stark contrast to *Mayoral v. Shehan*, 245 F.3d 934 (7th Cir. 2001), also relied upon by Plaintiff, wherein the Seventh Circuit denied qualified immunity to an officer where the inmate notified the officer that he needed protective custody, but she brushed him off and did nothing for him even after noting the inmates were rowdy and appeared intoxicated on an orange substance. *Id.* at 940.

As the Tenth Circuit stated, jailers "are neither obligated nor able to watch every inmate at every minute of every day," nor do they have a constitutional duty to monitor inmates constantly. *Gaston v. Ploeger*, 229 F. App'x 702, 711 (10th Cir. April 12, 2007) (unpublished). A factfinder may not infer deliberate indifference when an official was not aware of a risk, even where the

official would have been so aware of the risk had he monitored the inmates properly. *See id.* (explaining that, where record was clear that jailers were not aware of strange behavior described by decedent's cellmates, jury was not permitted to infer that their failure to notice, while amounting to negligence, contributed to the higher degree of fault required for deliberate indifference). While a corrections officer's knowledge of a specific threat or risk to an inmate's safety requires a reasonable response by the officer to protect that inmate, here the record does not contain enough facts from which a jury could infer that Padilla appreciated there was a risk to Granger's safety.

Furthermore, Plaintiff has not sought any Rule 56(d) discovery specific to this issue. Plaintiff, for example, did not request a deposition of Padilla. (*See* Freedman Smith Decl., ECF No. 70-3.) Consequently, because the evidence in the record, construed in Plaintiff's favor, does not create a genuine factual question that Padilla was aware of enough facts from which the inference could be drawn that a substantial risk of serious harm existed, Padilla is entitled to qualified immunity. *Cf. Leonard v. Lincoln County Bd. of Comm'rs*, 790 F. App'x 891, 894-95 (10th Cir. Oct. 10, 2019) (concluding that sheriff and deputies were not deliberately indifferent to inmate's safety because, even though inmate had numerous verbal confrontations with other inmate and staff knew that another inmate broke his glasses, officials were not on notice that he was at risk of being assaulted where plaintiff did not report most of the verbal confrontations, he did not identify inmate who broke his glasses, and his grievance only described the other inmate as a predator and requested that something be done with him because he was creating a serious problem); *Szymanski v. Benton*, 289 F. App'x 315, 318-19 (10th Cir. Aug. 14, 2008) (determining that plaintiff failed to adduce sufficient evidence of deliberate indifference of jail official, even though official was aware of keep separate active designation for two inmates following their verbal incident six weeks before, because in earlier incident their voices were not raised and he

26

had not observed any physical threat to plaintiff).

### 2. Dillon Samaniego

Defendants argue that there is no evidence Samaniego saw the attack, and any potential negligence in failing to witness it does not amount to deliberate indifference. Defendants additionally argue that, even if he saw the attack, there is no evidence that he could have prevented it or made it shorter. On the other hand, Plaintiff asserts that a genuine material fact exists as to whether Samaniego saw the attack and failed to respond to protect Granger.

If Samaniego witnessed the assault but failed to act to stop it when he had an opportunity to do so, then Plaintiff will have established deliberate indifference and a violation of clearly established Fourteenth Amendment law. *Greiveson*, 538 F.3d at 778 (if officer witnessed inmate assault, but failed to intervene, his actions constitute paradigm case of deliberate indifference); *Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 14 (1st Cir. 1990) (explaining that prison officer who was present at scene of assault on inmate, but stood by and failed to render aid even when he had opportunity to intervene or summon help, violated inmate's clearly established constitutional right to protection from violence at hands of other prisoners); *Stubbs v. Dudley*, 849 F.2d 83, 86-87 (2d Cir. 1988) (concluding that jury could find corrections official violated inmate's constitutional right where he had enough time to assess serious threat facing inmate from assault by other inmates and had opportunity to protect him at no risk to himself or security of prison, but he refused to permit him to pass with officer to safety behind door); *Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir. 1978) (holding that plaintiff alleged § 1983 claim where he alleged that he was brutalized by fellow inmates, correctional officers saw what was transpiring, yet they declined to intervene and allowed assault to continue). A claim of deliberate indifference, however, cannot be based on speculation about what a jail official might have seen or heard. *Lance v. Morris*, 985

F.3d 787, 795 (10th Cir. 2021) (affirming summary judgment on failure-to-provide-medical-care claim against jail official where official only was contacted once about plaintiff's condition without receiving complaints that he was in pain, and there was insufficient other evidence in summary judgment record that official entered pod, would have seen plaintiff, and his pain would have noticeable). An "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," does not constitute a constitutional violation under the Eighth or Fourteenth Amendments. *See Farmer*, 511 U.S. at 838.

Plaintiff argues that, even if Samaniego was not paying attention, this gross dereliction of his duties would amount to deliberate indifference. The Court disagrees on this point. As noted previously, jailers do not have a constitutional duty to monitor inmates constantly and negligence is not enough to state a Fourteenth Amendment claim. *Gaston*, 229 F. App'x at 711. Defendants are therefore correct that Samaniego cannot be held liable for an attack he did not see or was not otherwise made aware of at the time it occurred. However, if there are sufficient facts for a reasonable jury to conclude that he observed the attack when it began, yet he failed to act and allowed the attack to occur for approximately two more minutes, and/or then delayed medical care for an hour, he would have violated Granger's Fourteenth Amendment rights. Accordingly, the issue here is whether Plaintiff set forth enough factual evidence from which a reasonable jury could conclude that Samaniego witnessed the attack.

Plaintiff argues that a reasonable inference can be made that Samaniego saw the fight because the fight was obvious from the video monitors for more than two minutes, and he was working in master control that day. It is undisputed that Samaniego was on duty in the control room and was thus responsible for overseeing the video monitoring of the various pods. It is also undisputed that the videos captured approximately two minutes and 15 seconds of the fight on

camera. Other cameras showed inmates watching something with interest during the duration of the fight. So, if Samaniego were watching the monitors continuously, he would have observed the fight. Defendants' position, however, is that Plaintiff has no evidence that Samaniego was watching the monitors at the time of the fight.

In support of their argument, Defendants rely on *Hooks v. Atoki*, 983 F.3d 1193 (10th Cir. 2020), but its facts are distinguishable, and it is of limited utility here to either party. The Tenth Circuit determined in *Hooks* that there was sufficient evidence to establish the corrections officer's subjective awareness of the inmate-on-inmate attack where the officer was in the pod office, the plaintiff could see the officer through the window, and another jail employee heard the commotion from the same area. *See id.* at 1197-98, 1205. The *Hooks* court nevertheless ruled that, because the officer responded within 28 seconds of the attack, not enough time elapsed for a reasonable juror to find his response unreasonable. *Id.* at 1206. Its ultimate holding does not support Defendants' position, because here the officers did not render aid to Granger until about an hour after the attack. The Court thus cannot make a reasonable response determination as a matter of law. Nor does *Hooks* assist Plaintiff on the knowledge prong. *Hooks* concluded that it is reasonable to infer that an officer heard the attack when another person near him heard the attack. Passively hearing the same commotion is different from inferring that an officer was actively watching video monitors merely because he was assigned to the control room at the time, especially here where there is evidence that the control room officer had numerous other duties besides monitoring cameras.

Plaintiff additionally contends that a reasonable inference that Samaniego saw the fight can be made because his explanation for why he did not see the fight is undermined by other record evidence. Samaniego stated in his incident report that he was watching a female inmate in booking around 12:30 p.m., when the fight occurred, and he was unaware of the altercation. (Pl.'s Ex. 7,

ECF No. 70-7.) In Samaniego's July 18, 2020, dayshift log, there are entries regarding booking at 1154, 1242, and 1249, but not on or around 12:30 p.m. (*See* Pl.'s Ex. 9, ECF No. 70-9.) Moreover, Defendants expressly deny that Samaniego was monitoring the booking area at the time of the attack. (Pl.'s Ex. 8, ECF No. 70-8 at 15 of 17.) Their denial and the shift log are thus in tension with Samaniego's report on the issue, casting doubt on his explanation of what he was doing at the time and creating a potential credibility issue.

Plaintiff filed an affidavit of his attorney explaining that he seeks Samaniego's deposition to discover what he was doing during the attack, to probe inconsistencies in his reports and logs, and to get answers to other questions, such as his duties and blind spots in the cameras, among other questions. (*See* Freedman Smith Decl. ¶ 5, ECF No. 70-3.) Plaintiff's counsel made efforts to secure these facts by obtaining the incident reports, logs, and admissions of Defendants. Because the discovery Plaintiff has secured to date reveals inconsistencies in a key fact at issue, Plaintiff should be permitted to engage in Rule 56(d) discovery concerning this material factual issue.

Defendants nonetheless argue that it is speculative as to whether, even if Samaniego witnessed the attack, he could have done anything to shorten it. The attack, however, lasted nearly three minutes. Plaintiff should have an opportunity to explore in discovery the jail procedures for stopping attacks once they have begun and the timing of those processes. Plaintiff is also entitled to discovery on whether Samaniego understood there was an emergency from the pressing of the intercom twice, his training regarding responding to the intercom, and the reasons for the steps he took and why he did not take other measures. This evidence is relevant because Granger's medical care was delayed for an hour after the attack. The Court will therefore deny the motion for summary judgment as to Samaniego at this time until Rule 56(d) discovery is completed, after which the parties will be permitted to refile motions for summary judgment.

### 3. Billy Massingill

Plaintiff asserts both official and individual capacity claims against Warden Billy Massingill. The official capacity claim against Massingill is actually a claim against the county, *see Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006), so the Court will address that claim in the municipal liability section. As to the individual capacity claim, Plaintiff asserts that Massingill is personally liable for his failure to supervise, enforce policies, and implement policies necessary to respond to known dangers, which caused Plaintiff's injuries. Defendants contend that Massingill did not commit a constitutional violation and, even if he did, the law was not clearly established that any of his actions violated Plaintiff's rights.

#### a. Constitutional violation

Supervisor status alone is insufficient to support liability under § 1983; personal participation is essential. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). When an official is sued on the basis of his supervisory status and policy-making authority, a plaintiff may establish an affirmative link between the alleged violation and the supervisor's conduct by demonstrating that the defendant: (1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy, (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation, which in this case is deliberate indifference. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010); *Perry v. Durborow*, 892 F.3d 1116, 1121-22 (10th Cir. 2018). *See also Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (describing three prongs as "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind") (quoting *Dodds*, 614 F.3d at 1195).

#### 1) Personal involvement

Plaintiff's claim against Massingill is based on the following grounds: (1) history of previous inmate assaults at ECDC; (2) understaffing of ECDC creating a dangerous environment; (3) failure to enforce policies regarding supervision of detainees; (4) failing to prevent detainees from being housed in adjacent pods next to known enemies; (5) inadequate policies and practices regarding protective custody and that placed dangerous maximum-security detainees into medium and minimum-security housing units; and (6) failing to eliminate blind spots. Some of these policies allegedly led to the attack while others led to the attack going undetected in time to stop it. The Court will examine the evidence as to each theory in turn.

### a) History of previous assaults

According to Plaintiff, the high number of inmate assaults in the year before the attack, more than half of which were undetected by staff until afterwards, is evidence of a pervasive, well-documented risk of inmate-on-inmate attacks and of Massingill's failure to respond reasonably to them. Plaintiff argues that Massingill would have known about the high number of incidents because he was required by ECDC policy to conduct an annual assessment of inmate injuries, and that a reasonable jury could conclude that his failure to address the high number of assaults caused Plaintiff's injuries.

In response, Defendants contend that Plaintiff fails to connect the general inmate-on-inmate violence at ECDC with Rojas's attack of him, relying on *Szymanski v. Benton*, 289 F. App'x 315, 319 & n.2 (10th Cir. Aug. 14, 2008). In *Szymanski*, the inmate's claim against the sheriff was based on the failure of detention-center personnel to protect him from a specific inmate for whom staff had a "keep separate active" designation that an official entered after a verbal disagreement between the two inmates. *See id.* at 317. After that inmate attacked the plaintiff, he claimed an Eighth Amendment violation for failure to enforce the keep-separate order to protect him from that

inmate. *Id.* In response to the motion for summary judgment, the plaintiff argued that the sheriff was liable because there was long-term, pervasive violence at the detention center of which he was aware. *Id.* at 316, 319. The Tenth Circuit disagreed, concluding that the plaintiff had limited his complaint to the alleged failure of staff to protect him from the specific inmate, and that he did not claim that pervasive inmate violence made it possible for the inmate to attack him. *Id.* & n.3. Accordingly, it viewed the information about other prisoners as not relevant to the claim against the sheriff. *Id.*

Unlike in *Szymanski*, in this case, Granger alleges *both* that Defendants failed to protect him from Carrasco specifically *and* that constitutionally infirm conditions at ECDC, which led to the multitude of violent incidents in the preceding year, also caused his injuries. (*See, e.g.*, First Am. Compl. ¶¶ 37-39, ECF No. 76 (alleging that policies of inadequate supervision failed to prevent inmate-on-inmate attacks and prevented victims from being rescued in time to prevent additional injuries).) Granger has thus not limited his claim as did the plaintiff in *Szymanski*.

Turning then to the evidence, ECDC experienced 63 prior incidents of inmate-on-inmate assaults from August 8, 2019, through July 26, 2020, which Plaintiff's expert described as "incredible" given ECDC's low detainee capacity. Although Defendants fault Plaintiff for failing to connect the prior assaults to Rojas attacking Plaintiff, Plaintiff has not had an opportunity to conduct complete discovery on this issue. Plaintiff seeks inmate grievances for the prior year to see if there were any complaints of assaults or threatened assaults of which the staff would have been aware. He also requests reports and memoranda of assaults at ECDC for the three preceding years for similar reasons. The information sought is relevant to whether prior incidents of violence were facilitated by communication between adjacent pods, were due to improper classification of inmates, and/or were the result of understaffing. This evidence would help Plaintiff determine what

Massingill knew of a pattern-and-practice of inmate assaults and whether he failed to address them.

Moreover, Plaintiff's inadequate supervision claims are not limited to the failure to prevent the attack from occurring, but also the failure to prevent attacks from being prolonged with inadequate means for victims to be rescued. According to Plaintiff's expert, Daniel Vasquez, 33 assaults in the one-year reporting period went unobserved by ECDC staff (an average of 1.8 per month). (Vasquez Report 3, ECF No. 70-14.) Mr. Vasquez opines that these high numbers of unobserved assaults reveal ineffective security measures. (*Id.*) An independent report commissioned by ECDC in 2018 recommended a second officer be assigned to the control room to improve supervision, yet Massingill failed to do so. Plaintiff is entitled to additional discovery to determine Massingill's knowledge of the previous assaults, his responses to that information, and whether his management practices led to the assault on Granger not being detected in time to rescue him from a prolonged attack, failing to prevent additional injuries and pain and suffering. *Cf. Keith v. Koerner*, 843 F.3d 833, 847 (10th Cir. 2016) (concluding jury questions existed as to whether warden was personally involved in violation of inmate's rights to not be sexually assaulted in prison based on evidence that his responses to prior sexual misconduct and enforcement of policies were inadequate).

### b) Understaffing

Plaintiff argues that understaffing contributed to the pattern of inmate assaults, including his own injuries. He submitted evidence that ECDC's institutional security plan relied largely on staff walkthroughs through pods at approximately 30-minute intervals and monitoring of videos of the pods by an officer in master control. ECDC had a third-party report commissioned, which set forth certain staffing and surveillance inadequacies at the jail. According to the May 4, 2018, final report, if all housing units in ECDC were in use, ECDC needed 70 detention officers and 98

total staff to operate the facility safely and securely, but if the Omega Units were closed, ECDC needed 55 detention officers and 82 total staff. (*See* Pl.'s Ex. 17 at viii, ECF No. 70-17.) Yet, in July 2020, ECDC only had 44 detention officers available to work, at least 11 fewer detention officers than recommended. (*See* Pl.'s Ex. 19, ECF No. 70-19.) The report also specifically recommended assigning a second officer to the control room during busy daytime hours from 6 am to 6 pm because it "was not possible for the single staff assigned to this post to adequately monitor the camera system, answer phones, and control the opening and closing of every door along with their many other duties." (Defs.' Ex. I at 83, ECF No. 83-1.) The report found that the control room operations were "key to facility security and response to emergency incidents," and that "the responsibilities of the existing post" were "too great for any single individual, especially during the more active daytime hours." *Id.* Plaintiff's expert agrees and opines that the understaffing led to Granger's serious injuries. (Vasquez Report 4, ECF No. 70-14.) Plaintiff is entitled to depose Massingill concerning understaffing to determine his knowledge of the report's recommendations, whether ECDC was understaffed, his knowledge about potential dangers at ECDC due to the staffing levels and due to the lack of a second monitor in the control room, and his response, if any, to the recommendations. *See Thompson v. Lengerich*, 798 F. App'x 204, 212 (10th Cir. Dec. 23, 2019) (unpublished) (concluding that inmate's Eighth Amendment claim against warden for violation of his right to be safe when among other inmates survived dismissal where plaintiff alleged that understaffing caused staff responses to inmate fights to be delayed, leaving inmates injured).

### c) Failure to enforce walkthrough and monitoring policies

Plaintiff also asserts that Massingill did not ensure the walkthrough policies were implemented by staff, as evident from the watch log on the day in question and his failure to

discipline either Padilla or Samaniego for their failure to perform their duties on the day in question. "The knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008). The watch log on the day in question, however, does not establish a pattern of failing to review watch logs or failing to implement discipline for critical safety lapses by Massingill prior to the day of the incident. Moreover, Massingill's alleged failures to reprimand occurred *after* the event in question, as the only policy violations by Padilla and Samaniego that Plaintiff points to were those that occurred on the day of the attack. As the Tenth Circuit has stated, "basic principals of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." *Durkee v. Minor*, 841 F.3d 872, 877 (10th Cir. 2016) (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (emphasis in original)). This evidence does not support a finding that Massingill failed to enforce ECDC's supervision policies.

Plaintiff, however, seeks hallway logs, grievances, and master control logs for the year preceding the attack to see if there is a pattern of inadequate supervision, which would be relevant to the issue of whether inadequate staffing was creating dangerous conditions in the jail. (*See* Freedman Smith Decl. ¶ 5, ECF No. 70-3.) Plaintiff has established a need for this Rule 56(d) evidence to determine how staffing levels affected supervision of inmates, what Massingill knew about whether staffing levels were causing insufficient monitoring, and his response to this information.

### d) Failure to prevent known enemies from being placed in adjacent pods

Next, Plaintiff contends that ECDC maintained a known dangerous condition – the doors between the Kappa and Gamma pods allowed communication between pods, officials knew that detainees regularly spoke to each other through the doors, yet Massingill failed to prevent known

incompatible inmates from being housed next door to each other. Defendants respond that there is no evidence that Massingill was aware of a risk to Plaintiff from inmates in the Kappa pod, including Rojas. According to Defendants, Massingill acted reasonably in separating Granger in a different pod from Carrasco and in placing Granger in a pod that did not contain any of the inmates Granger identified as incompatible.

Plaintiff nevertheless argues that the risk to inmates was obvious where a known incompatible could easily communicate through a door with other detainees who were in the same pod as his enemy. While evidence indicates that officers instructed detainees not to talk to each other through the doors, that evidence alone is not enough to establish a known, obvious danger. But, if there is evidence of a past pattern or practice of assaults occurring through orders from adjacent incompatible inmates, that evidence could support an inference that Massingill knew of this danger and failed to implement policies to correct the problem.

The current record does not establish such a pattern or practice. Although Plaintiff presented evidence of 63 prior incidents of inmate violence, Plaintiff has not shown that any of these incidents arose from a known incompatible ordering a hit on an inmate in an adjacent pod. *Cf. Durkee*, 841 F.3d at 877 (concluding that plaintiff failed to show sheriff was deliberately indifferent where "detention center's policy of unshackling inmates in the booking area next to the visitation room does not appear problematic on its face; nor has it proven problematic in its application—at least on the record before us—save the present isolated incident"). Plaintiff, however, seeks reports and memoranda concerning assaults at ECDC for three years prior to the attack. That information is relevant to determine if the housing of incompatibles in adjacent pods was a known danger. Plaintiff should receive Rule 56(d) evidence on this issue.

> **e)  Inadequate protective custody policies and practices and failure to protect detainees from**

**maximum-security detainees**

Plaintiff asserts that Massingill did not have necessary policies for explaining when a detainee should be placed in protective custody and for keeping dangerous, maximum-security detainees out of medium/minimum security settings. According to Plaintiff, that Granger was an effeminate homosexual with many known enemies at the facility made him highly vulnerable to attack, such that he should never have been placed in a general population pod. Evidence in the record suggests that Massingill would have reviewed Granger's initial classification and housing assignment and approved his placement in general population. Granger subsequently was sexually harassed by other detainees. While officials removed him promptly from that pod, rather than place him in a restrictive housing area, they placed him in another general population pod adjacent to Carrasco, a known incompatible detainee who officers classified as maximum security on six previous occasions, and was classified as a maximum-security inmate on July 1, 2020, within a few weeks of the incident. Because Massingill approves initial housing assignments, there is evidence suggesting that he may have been personally involved in the decision to house Carrasco, but the extent of his involvement in Carrasco's and Granger's classification and housing assignments is unclear.

Plaintiff, however, has not received all discovery pertaining to these classification issues. He seeks classification forms and scoring instruments for Granger, Rojas, and Carrasco, and Carrasco's disciplinary history. (Freedman Smith Decl. 3-4, ECF No. 70-3.) This discovery is relevant to whether Carrasco's housing assignment created conditions posing a risk of serious harm to inmates housed with or near him, whether Massingill knew that Carrasco's housing placement posed such a risk, and the extent of his personal involvement in Carrasco's classification and housing decisions. Plaintiff also seeks training curriculum regarding classification and housing

decisions, including training on when to assign an inmate to restrictive housing. Plaintiff is entitled to Rule 56(d) evidence on these topics before this Court rules on Massingill's motion summary judgment. *Cf. Ryan v. Burlington County*, 889 F.2d 1286, 1293 (3d Cir. 1989) (recognizing inmate's right to be classified and housed separately from known dangerous inmates); *Avalos v. Bd. of County Comm'rs of Dona Ana County*, No. CIV 06-0836 RB/LAM, 2007 WL 9733655, at 17 (D.N.M. Aug. 29, 2007) (denying summary judgment to jail officials where jury could find they were aware of risk posed by inmate with history of assaults on other inmates and threats to staff that were longstanding, pervasive, and well-documented).

### f)   Failure to eliminate blind spot

According to Plaintiff's final theory of liability against Massingill, there were known and obvious blind spots in the video camera footage, yet Massingill did not remedy them. Although Plaintiff alleges that many assaults went undetected, he has not shown how many undetected assaults occurred in the specific blind spot at issue. Moreover, it is undisputed that the video captured all by 27 seconds of the fight, so the fight was mostly captured by the camera. Although Samaniego says he did not see the fight, the record does not show that he would otherwise have observed the fight but for the blind spot. Based on the current record, Plaintiff has not established the blind spot behind the half wall posed a substantial risk of harm to inmates housed in that pod. Plaintiff, however, seeks Rule 56(d) discovery on this issue. He is entitled to seek discovery to determine if the blind spot in the video footage caused Samaniego's failure to witness the attack, and if so, whether this blind spot was known to prevent officers from observing and being able to stop other attacks in the three years preceding the attack.

### 2) Causation

Plaintiff must additionally prove Massingill's personal involvement set in motion a series

of events that he knew or reasonably should have known would cause others to deprive Plaintiff of his constitutional rights. *See Keith*, 843 F.3d at 847. Defendants assert that Massingill took no action that caused the attack. As discussed above, Plaintiff has presented some evidence of policies and practices that Massingill may have been personally involved in. Plaintiff is entitled to additional discovery on whether those policies and practices set in motion events that Massingill knew or should have known would a create the conditions for Carrasco to order an attack on Plaintiff and for Rojas to carry out that attack. Plaintiff should also be permitted Rule 56(d) discovery on the issue of whether there was a failure to adequately staff the control room and whether any such failure contributed to the length of the attack being two and a half minutes without officers responding to stop it as it was occurring. *Cf. Berry*, 900 F.2d at 1498-99 (concluding that jury could reasonably conclude from evidence that city's conduct was moving force in bringing about inmate's murder based on its policies of not locking down prisoners at night, not requiring wire brooms to be inventoried, not separating crime partners, and having only one detention officer to supervise entire prison). Massingill is therefore not entitled to summary judgment on the causation element at this time.

### 3) Deliberate indifference

Deliberate indifference may be shown where the policymaker was aware of a substantial risk to inmate health and safety due to inadequate staffing or surveillance deficiencies and the policymaker failed to make changes or arrange funding to correct the deficiencies. Plaintiff's Rule 56(d) discovery requests are relevant to what Massingill knew concerning the risks of housing Carrasco in a medium-security pod, of housing known incompatible inmates in adjacent pods, and how staffing levels were affecting the quality of monitoring and surveillance. The Court will therefore permit Plaintiff additional discovery before ruling on this issue. *Cf. Lopez*, 172 F.3d at

762-63 (denying summary judgment to sheriff and county where plaintiff presented evidence that sheriff knew that policies created understaffing at jail and caused deficiencies in monitoring inmates sufficiently to prevent injuries, yet failed to act to take reasonable steps to prevent risk, like installing video camera systems or hiring additional staff).

**b. Clearly established law**

Massingill is entitled to raise the defense of qualified immunity for the individual capacity claim against him. The law, however, was well-settled at the time of the incident that the Fourteenth Amendment requires jail officials to take reasonable measures to safeguard inmates like Plaintiff from other inmates by correcting known, unsafe conditions like those alleged in this case. *See Farmer*, 511 U.S. at 842-43 ("[I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'").

Plaintiff has met his Rule 56(d) burden to show that specific discovery is needed on causation and Massingill's personal involvement and state of mind, in particular to determine what Massingill knew concerning the conditions at ECDC and what, if any, remedies he implemented. Plaintiff has identified specific evidence that was unavailable to him, why those facts could not be presented without a lift of the discovery stay, and that his counsel took measures to try to obtain those facts. Viewing the evidence favorably to Plaintiff, and the evidence Plaintiff seeks in discovery, the Court cannot find as a matter of law based on the incomplete record that Massingill took reasonable measures to ensure Plaintiff was safe from Carrasco, a potentially dangerous,

known incompatible, maximum-security inmate who was placed in a medium-security pod adjacent to Granger where he could communicate with other inmates in Granger's pod. The discovery still needed to develop the relevant factual issues preclude granting Massingill's request for summary judgment based on qualified immunity. *Cf. Farmer*, 511 U.S. at 848-49 (remanding for reconsideration of Rule 56(f) motion for additional discovery where record did not clearly establish respondents' entitlement to judgment as matter of law on issue of subjective knowledge); *Lopez*, 172 F.3d at 761 (concluding that record contained enough evidence from which jury could conclude that standards for supervision of prisoners were violated, including deficiencies in staffing levels and supervision; that the failure to follow them posed a substantial risk of harm; and that sheriff knew of dangerous conditions prevalent in jail, but failed to take reasonable measures to ensure the safety of prisoners); *Estate of Yoemans by and through Ishmael v. Campbell*, 501 F.Supp.3d 1034, 1050-52 (D. Colo. 2020) (concluding that genuine dispute of fact existed as to whether jail official knew that classifying inmate with potential for violence as maximum security and placing him in general population would create substantial risk of harm to safety of other inmates, including plaintiff, requiring denial of summary judgment to jail official). The Court will therefore deny the motion for summary judgment at this time to allow discovery.

### B.  Municipal Liability

A municipality can be liable under § 1983 when "the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). To establish causation a plaintiff must show that "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). A municipal policy or custom may take a number of forms: (1) a formal regulation or policy, (2)

a custom amounting to a widespread practice that is so well-settled as to constitute a custom with the force of law, (3) decisions from a final policymaking authority, (4) ratification by final policymakers of decisions of subordinates to whom authority was delegated, or (5) the failure to adequately train or supervise employees amounting to deliberate indifference. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

Plaintiff here asserts that both Eddy County and Massingill, as the chief administrator of ECDC, are final policymakers for ECDC. Defendants do not dispute this argument. Under New Mexico law, jails are under the control of the sheriff, independent contractor, or jail administrator hired by the board of county commissioners. *See* N.M. Stat. Ann. § 33-3-1(A). Eddy County has authority to adopt proposed rules and regulations from the jail administrator for the jail. N.M. Stat. Ann. § 33-3-8. Decisions by ECDC or Massingill concerning ECDC thus constitute municipal policies or customs. *See Abila v. Funk*, No. CIV 14-1002 JB/SMV, 2016 WL 9021834, at *30-31 (D.N.M. Dec. 14, 2016) (concluding that warden of Eddy County Detention Center was final policymaker for Eddy County regarding Eddy County Detention Center).

To show a constitutional violation under the Fourteenth Amendment for a facially lawful municipal action, a plaintiff must demonstrate that a municipal action was taken with deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the action. *Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 411 (1997). This "deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). A plaintiff can prove the requisite notice through evidence of a pattern of unconstitutional conduct, or short of a pattern, with evidence that a

violation of constitutional rights is a highly predictable or plainly obvious result of the municipality's conduct. *Id.* at 1307-08. A municipality may not be held liable where its officers or employees did not commit an underlying constitutional violation. *Graves*, 450 F.3d at 1218.

Defendants first argue that they are entitled to summary judgment on the municipal liability claim because Plaintiff cannot show an underlying constitutional deprivation. For the reasons given above, Plaintiff is entitled to additional Rule 56(d) discovery before this Court can determine whether Samaniego and/or Massingill in his individual capacity violated Plaintiff's Fourteenth Amendment rights. Eddy County and Massingill in his official capacity are thus not entitled to summary judgment on this ground at this time.

Next, Defendants assert that no County policy or practice was enacted with deliberate indifference or was the moving force behind Rojas' assault of Plaintiff at the direction of Carrasco. They assert that ECDC's policy of housing known incompatibles in separate pods, even in adjacent pods, is not facially unconstitutional and was reasonable. They further contend that their policies for walkthroughs, monitoring, self-help kiosks, and intercom systems were constitutional. Finally, according to Defendants, there is no direct causal connection between allegations of inadequate supervision and pervasive violence because Rojas would have attacked Plaintiff once he had the opportunity, regardless of ECDC policy.

Because Massingill's decisions constitute those of Eddy County, the reasoning as to the Court's denial of summary judgment to Massingill in his individual capacity largely applies to the municipal liability claim. Plaintiff is entitled to additional Rule 56(d) discovery to explore issues related to his municipal liability claims, including whether there was a longstanding, pervasive, and well-documented risk of inmate attacks at ECDC in the years leading up to the incident and the reasons why so many of the incidents went undetected by staff;  what, if any, response ECDC

and/or Massingill had to the 2018 report's staffing recommendations; whether Massingill failed to implement an adequate classification system that protected vulnerable and/or medium-security inmates from dangerous maximum-security inmates; and whether a practice of failing to keep dangerous maximum-security inmates from nonviolent inmates caused Granger's injuries. Viewing the facts in the light most favorable to Plaintiff, and the need for Rule 56(d) discovery of these issues, the Court will deny summary judgment to ECDC and Warden Massingill in his official capacity at this time.

**IT IS THEREFORE ORDERED** that Defendants' *Motion for Summary Judgment on the Basis of Qualified Immunity* (**ECF No. 47**) should be **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendants' motion for summary judgment should be **GRANTED** as to Plaintiff's Fourteenth Amendment claim against Defendant Padilla (Count I).

2. Defendants' motion for summary judgment should otherwise be **DENIED** at this time.

3. Plaintiff is entitled to additional discovery under Rule 56(d).

4. Within 60 days from the date of the completion of discovery, the parties may file renewed motions for summary judgment for the Court's resolution on the fully developed summary judgment record.

SENIOR UNITED STATES DISTRICT JUDGE

45